```
 1                    UNITED STATES OF AMERICA
 2             EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
 3                   909 FIRST AVENUE, SUITE 400
 4                  SEATTLE, WASHINGTON  98104-1061
 5
 6
 7   ROSA GAONA,                        )
 8                                      )
 9                 Complainant,         )
10                                      )
11   v.                                 )
12                                      )
13   JOHN E. POTTER, Postmaster         )
14   General, U.S. Postal Service,      )
15                                      )
16                 Respondent Agency.   )
17   _____)
18
19   EEOC Case Nos. 380 99 8080X, 380 99 8121X and 380 A1 8110X
20   Agency Nos. 4E-995-0007-98, 4E-995-0025-98 and 4E-995-0008-98
21
22
23
24
25
26                           HEARING
27                       Juneau, Alaska
28                      September 9, 2002
29
30
31
32
33
34   BEFORE:   HON. JAMES CARROLL, Administrative Law Judge
35
36
37   APPEARANCES:
38
39   For the Complainant:      ROSA GAONA
40                             9951 Stephen Richards, #19
41                             Juneau, Alaska  99801
42
43   For the Agency:           JIM KAMMERMEYER
44                             Labor Relations Specialist
45                             United States Postal Service
46                             3201 C Street, Suite 506
47                             Anchorage, Alaska  99503-9401
48                             (907) 564-2952
```

                          KRON ASSOCIATES
                1113 W. Fireweed Lane, Suite 200
                      Anchorage, Alaska  99503
                           (907) 276-3554

EXHIBIT F - Page __1__ of 12

| | | |
|---|---|---|
| 1 | | have denied that? |
| 2 | A | He did whatever he possibly could to keep me off work. |
| 3 | Q | And that's why Dailang probably would have denied it? |
| 4 | A | Oh, she has no authority sir, she has to follow what the Postmaster decides. |
| 6 | Q | That's if the Postmaster made that decision. |
| 7 | A | He had to have made that decision, the supervisors do not make decisions, sir, unless the Postmaster agrees to those decisions. |
| 10 | Q | Okay. How would you relate that incident, this incident on case number one, and we've decided that it would be sex, physical disability, reprisal on those issues, how do you relate those issues to the denial of that sick leave? |
| 14 | A | Well, sir, Mr. Kammermeyer, I have been a union President from 1993 till about 1995. |
| 16 | Q | Okay. |
| 17 | A | I filed a lot of grievances for my employees. There were issues that I will not bring up because I'm not supposed to surrounding the Postmaster's son-in-law. |
| 20 | Q | Okay. |
| 21 | A | Okay? |
| 22 | Q | Uh-huh (affirmative). |
| 23 | A | I had to bring these issues up because the carriers were coming to me very mad about this situation that was surrounding the Postmaster's son-in-law. |

1  Q    All right.
2  A    So as the union President I went in to deal with these
3       issues. Unfortunately it was not to my benefit because
4       from that point on I was considered blackballed.
5  Q    Okay.
6  A    I'm not a good person because I turned this.....
7  Q    So you think he's reprising against you because.....
8  A    Ab.....
9  Q    .....you filed all these grievances?
10 A    Absolutely, there is no question. I have paperwork here
11      that -- you know.
12 Q    Okay.
13 A    It -- it just -- I can't even verbally go on and on about
14      it because it was a daily issue, it was a daily thing that
15      went on.
16 Q    Because you filed grievances about his son-in-law?
17      (Indiscernible).
18 A    It -- well, his son-in-law has been involved in all of
19      this.
20 Q    Okay.
21 A    From one -- either one issue or another.
22 Q    Let's go to the second case, was a case in which on
23      November 22, 1997 you were denied advanced sick leave.
24 A    Yes sir.
25 Q    Okay. Do you remember that?

KROB ASSOCIATES
1113 W. Fireweed Lane, Suite 200
Anchorage, Alaska 99503
(907) 276-3554

|   |   |   |
|---|---|---|
| 1 |   | route efficiently because I care about my job, but again |
| 2 |   | was turned down several times. So I finally went to |
| 3 |   | Department of Vocational Rehab for help because they could |
| 4 |   | help me back the laws that the Postal Service has to |
| 5 |   | follow. And of course I was put through -- you know, they |
| 6 |   | had to talk to the doctors, they had to look up my |
| 7 |   | records, they had to make sure that I was considered |
| 8 |   | disabled, and I am considered disabled. I wanted -- I |
| 9 |   | actually asked for John Osborne to come in as a witness |
| 10 |   | but he was denied, he was part of Department of Vocational |
| 11 |   | Rehab and he is the one that has helped me through this |
| 12 |   | whole process. Anyway, Joel Bergenbaken -- okay, this is |
| 13 |   | why the situation happened. I had a EEO because I was not |
| 14 |   | being accommodated..... |
| 15 | Q | Remember we're trying to focus on..... |
| 16 | A | Right. |
| 17 | Q | .....the incident (indiscernible). |
| 18 | A | And I'm trying to -- yes, I'm sorry. |
| 19 | Q | That's okay, no sweat. |
| 20 | A | There was a mediation meeting that Joel Bergenbaken, |
| 21 |   | Vocational Rehab, and I set up with the Postal Service. |
| 22 | Q | Okay. |
| 23 | A | Okay? |
| 24 | Q | Uh-huh (affirmative). |
| 25 | A | The mediation meeting, because I wanted to not follow |

| | | |
|---|---|---|
| 1 | | through with the EEO, I -- I wanted to go to mediation |
| 2 | | because I felt maybe we could work something out here. |
| 3 | | Okay? I -- I've always been wanting to work something |
| 4 | | out. So Jim Donaghey was to be there, Ruth Vincent was |
| 5 | | there at the mediation meeting, there was a mediator, I |
| 6 | | can't remember her name, myself, Ron Ahrens was supposed |
| 7 | | to be there but he had emergency leave. This all |
| 8 | | surrounded the fact that we needed to mediate and get |
| 9 | | things calmed down at the Post Office for me. |
| 10 | Q | Okay. |
| 11 | A | Anyway, it was I believe a day before the meeting, and |
| 12 | | this was not talked to anybody, nobody knew, this was a |
| 13 | | private meeting. And I went out on the back dock and |
| 14 | | Stuart Akagi started yelling and screaming at me about |
| 15 | | being a troublemaker, now what are you doing Rosa, going |
| 16 | | on and on and on with Scott Dornbirer standing there, Bill |
| 17 | | Jacobi is over there, and he is just yelling and screaming |
| 18 | | at me because I am trying to get things mediated for |
| 19 | | myself. It was none of his business, he shouldn't have |
| 20 | | known about it. This was a private -- nobody knew. This |
| 21 | | was a -- a mediation meeting done through the EEOC and he |
| 22 | | knew he shouldn't have known, he had no reason to be mad, |
| 23 | | it had nothing to do with him. |
| 24 | Q | Was he a union steward at the time? |
| 25 | A | No. |

| | | |
|---|---|---|
| 1 | A | .....had surgery for that. |
| 2 | Q | Okay. It looks like about a month after you started |
| 3 | | working at the Federal Building as the manager we have an |
| 4 | | EEO that's filed by Rosa Gaona. Do you know Rosa Gaona? |
| 5 | A | Yes, I do. |
| 6 | Q | Okay. And you're familiar with Rosa, you've worked with |
| 7 | | her? |
| 8 | A | Yes. |
| 9 | Q | Okay. Were you her direct supervisor? |
| 10 | A | No. |
| 11 | Q | Okay, who was..... |
| 12 | A | As the man..... |
| 13 | Q | ......her direct supervisor? |
| 14 | A | I'm sorry. As the manager I had a supervisor who worked |
| 15 | | directly with the delivery..... |
| 16 | Q | Who was that? |
| 17 | A | .....services. And at that time it was Dailang -- |
| 18 | | Dethsemane Saceda. |
| 19 | Q | Okay. What we have here is we have an EEO complaint that |
| 20 | | says basically that she was denied advance sick leave on |
| 21 | | November 22, 1997. Do you recall any of that? |
| 22 | A | Yes, I do. |
| 23 | Q | Okay. Can you tell us a little bit about what happened |
| 24 | | and how it started? |
| 25 | A | Rosie came to work one morning and said that she wanted to |

```
 1              apply for advance sick leave and I said that I wasn't able
 2              to give that to her, that only advance sick leave could be
 3              authorized by the Postmaster but that I would take her
 4              information, that she needed to fill out the form and --
 5              and we would send it in to the Postmaster. And
 6              that's.....
 7   Q          And you did -- you sent it down to the Postmaster and what
 8              did the Postmaster say?
 9   A          Well, in discussion during that I looked at Rosa's past
10              records, her 3972's which are the forms that we keep that
11              we put down all the absences, and saw that she had a very
12              poor sick leave record and that we didn't have a lot of
13              documentation as for the reasons why she was gone. I did
14              know that -- at that time that she'd been out, just
15              looking at the file, for a number of -- of days during --
16              due to a accident that apparently happened in 1995. But I
17              didn't have anything.....
18   Q          Did you indicate to Mr. Donaghey when you talked to him
19              that her record looked like it did?
20   A          Yes, and I said that I -- I felt that what -- that she
21              should be put on restricted sick leave.
22   Q          And you and him had a discussion about it?
23   A          Uh-huh (affirmative).
24   Q          Not only did you deny them the -- or did he deny the
25              advance sick leave request you also asked for restricted
```

KRON ASSOCIATES
1113 W. Fireweed Lane, Suite 200
Anchorage, Alaska 99503
(907) 276-3554

```
 1        sick leave?
 2   A    Yes, I -- I asked him for permission to go ahead and --
 3        and give her a restricted sick leave letter. He at that
 4        time was the one that had to write the denial for advance
 5        sick leave because, like I said earlier, only the
 6        Postmaster could do that.
 7   Q    Okay.
 8   A    But I did give -- he did send me the -- the letter down to
 9        present to her.
10   Q    What's the authority for us to do that, is that something
11        a supervisor can do?
12   A    No. I looked it up I believe in the ELM.
13   Q    So there's a procedure that we have to use.....
14   A    Yes.
15   Q    .....if you want to put somebody on restricted sick leave?
16   A    Yes.
17   Q    You just can't all of a sudden say I want to put you on
18        it, it has to be based on the record or.....
19   A    Yes.
20   Q    Okay.
21   A    The -- the Postmaster would take into (indiscernible) I'm
22        certain a number of facts.
23   Q    Is it a permanent thing?
24   A    Permanent that.....
25   Q    Permanent that they're on restricted sick leave once
```

KRON ASSOCIATES
1113 W. Fireweed Lane, Suite 200
Anchorage, Alaska  99503
(907) 276-3554

EXHIBIT F - Page 8 of 12

1                they're on it.
2    A   No -- no, the letter that I gave her stated that we would
3        have a review, I don't exactly remember when I said, but
4        would review it an X amount of months and if her sick
5        leave had improved or she had followed the directions in
6        the -- in the letter to provide documentation when she was
7        out sick that we would pull the letter.
8    Q   Okay. Jim gave you the authorization then to do that?
9    A   Yes.
10   Q   Okay.
11   A   And I wrote the letter.
12   Q   You wrote the letter and sent it to her. Now you'd only
13       been there a month.
14   A   Uh-huh (affirmative).
15   Q   So did you have any preconceived notions about Rosa?
16   A   No, only from the records.
17   Q   Okay. Did you talk with any of the other carriers there
18       about Rosa?
19   A   Well, there was always talk on the floor about people that
20       sometimes they felt weren't pulling their own fair share
21       as they would say.
22   Q   Did the previous manager pass down information to you
23       about her and.....
24   A   No, I had nothing.
25   Q   Okay. So, do you -- tell me something, do you -- are you

KRON ASSOCIATES
1113 W. Fireweed Lane, Suite 200
Anchorage, Alaska 99503
(907) 276-3554

219

1   Actually it's January 10th. On January 10th of 2000 the
2   Complainant called in due to an emergency and was charged
3   with AWOL and that AWOL eventually resulted in a
4   suspension that you issued to her. Do you know anything
5   about that?
6 A Yes.
7 Q Okay. And what was that about, your recollection?
8 A On the 10th when I got to work I had received a message
9   from -- from a clerk, and I don't remember which clerk it
10   was, stating that Rosa had called before I got there and
11   told me -- or to give me a message that she was -- that
12   she was not going to be to work, that something was -- had
13   happened to her -- something had happened to her cat. So
14   I -- I called Rosa -- I tried to call Rosa and I couldn't
15   get a -- no answer so I left a message that a cat wasn't
16   in the provision of emergency annual leave and that I
17   needed her to come to work because we were short of
18   carriers. So not getting a hold of her and everything I
19   -- you know, I -- I didn't receive a reply or anything.
20   The next morning, once again before I got to work, Rosa
21   had called and left another message that she couldn't be
22   in that day. So I -- I took the steward, the union
23   steward in the office with me just in case I talked to
24   Rosa, and I called her and she did answer. And I -- and I
25   said Rosa, I said I -- you know, we're real short, I need

KRON ASSOCIATES
1111 W. Firewood Lane, Suite 200
Anchorage, Alaska 99503
(907) 276-3554

220

1   you, and she said I can't come in. And I said Rosa, you
2   know -- and she explained that her cat had got lost and
3   that something had attacked the cat and that's why she was
4   gone the day before and -- and the 11th, the day I talked
5   to her, she said that she had taken her -- her cat to the
6   vet, the vet had done some work on it and she needed to be
7   by it to be by the -- the cat -- the litter box because
8   the cat couldn't go to the -- needed some assistance. And
9   I -- I did state to her, well, you know, why didn't you
10  leave it at the vet and you could come to work then and
11  she didn't -- she said she didn't trust the vet. So --
12  but -- (indiscernible), you know. So I told her -- once
13  again, I said Rosa, I -- I need you here to work, this is
14  -- emergency annual leave is not for a cat and provisions
15  for cats or animals and -- and she said I can't. And I
16  said Rosa, you -- you realize that I'm going to charge you
17  AWOL and she said, well, I'm going to -- I -- I got to do
18  what I got to do, and that was -- that was our
19  conversation.
20 Q  So then as a result of that you issued her a seven day
21  suspension? Okay.
22 A  And there was -- actually there was two specifications.
23  We had already -- all the employees were instructed to --
24  when they called in for any unscheduled absence they was
25  to talk to a supervisor and not leave a message with a --

| | | |
|---|---|---|
| 1 | | with a -- a clerk or (indiscernible). |
| 2 | Q | And you're saying what she had done was she had not left a |
| 3 | | message with a supervisor? |
| 4 | A | She had called in before I got to work and -- and talk to |
| 5 | | a -- just a clerk. |
| 6 | Q | Okay. I refer you to page 56 of this file, 0008 Judge |
| 7 | | Carroll and Rosa. Is that the letter that issued her? |
| 8 | A | Yes. |
| 9 | Q | Okay. Can you tell me, did you consider any other |
| 10 | | discipline that she'd had in that letter as well in giving |
| 11 | | her a seven day suspension? |
| 12 | A | No. |
| 13 | Q | There's a letter of warning that you cite in there I |
| 14 | | believe. The next page I believe it's on._ |
| 15 | A | Where she had been -- no, she had been issued a letter of |
| 16 | | warning, failure to follow instruction. I believe this |
| 17 | | was the one where..... |
| 18 | Q | So she had had -- my point is she had had other letters of |
| 19 | | warning already on her record, so..... |
| 20 | A | Right. |
| 21 | Q | .....the next step in progressive discipline was what? |
| 22 | A | (Indiscernible) was a seven day suspension. |
| 23 | Q | Okay. So you felt this was proper? |
| 24 | A | Right. |
| 25 | Q | Okay. All right. Can you tell me, do you know who |