**LAW OFFICE OF PATRICIA S. ROSE**
Patricia S. Rose, WSBA #19046
Attorney for Plaintiff
157 Yesler Way, Suite 503
Seattle, Washington 98104
(206) 622-8964 (phone)
(206) 622-2593 (fax)
Email: prose83897@aol.com

UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | |
|---|---|
| ROSA S. GAONA,<br><br>                Plaintiff,<br><br>        v.<br><br>JOHN E. POTTER,<br><br>                Defendant. | No. CV 3:04-CV 00118-JKS<br><br>DECLARATION OF SUSAN HALL IN SUPPORT OF PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDAN'TS MOTION FOR SUMMARY JUDGMENT OF DISMISSAL |

I, SUSAN HALL, am over eighteen years of age and am competent to testify to the following. This statement is based on my personal knowledge, and is true to the best of my recollection and belief.

DECLARATION OF SUSAN HALL
IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT-1

1. I am a former employee of the United States Postal Service in Juneau Alaska. I started as a part-time flexible (PTF) City Carrier downtown at the Federal Building. I worked in that position until approximately the spring of 2002 when I was given an opportunity to perform as a 204B or Assistant Supervisor. 204Bs are not permanent supervisors but act in that capacity while still technically bargaining unit employees. I worked off and on as 204B until I took maternity leave for the birth of my child in December 2002. I was on leave until March of 2003. However, in January 2003, I was contacted regarding ASP or taking the supervisor test by Deborah Brockman, the Human Resources person for the Postmaster. In February of 2003, I was flown to Anchorage for the interview process and ultimately learned that I was selected. From approximately April to July of 2003, I was in Anchorage for classroom and on-the-job training. After my return, I began work again as a Level 15 Carrier Supervisor at the downtown station but ultimately transferred to a supervisory position at the Mendenhall station overseeing mail processing employees in November 2003 I basically worked that job until I obtained my current position with the National Marine Fisheries Service of the National Oceanographic and Atmospheric Administration and started in

DECLARATION OF SUSAN
HALL IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT-2

December of 2004 without a break in service. I had obtained the job in early November but was not allowed to leave my job earlier because of the increased high holiday mail volume and I wanted to protect my federal career and stayed on.

2. To the best of my recollection, at the time I started at Mendenhall, there was at least one vacancy for a Maintenance Custodian on nights. It was a bid job that had not been filled, to my knowledge, for awhile. Both Monroe and John worked various swing shift tours but there was a slot that was not filled. Monroe was very resentful that Rosa ultimately got one of those vacant Custodial slots as a modified duty assignment; he filed a grievance saying that she was taking Clerk craft work. I found this to be unusual due to his constant complaining about the overtime he and another custodian had to work before the position was filled.

3. I overheard derogatory remarks about Rosa Gaona when she worked at the Federal Building facility. These were comments made by the majority of the male carriers and largely from Stuart Akagi, a City Carrier. He would complain about her not doing her job and suggested that she was "milking it" in reference to her not being able to physically carry her bid

DECLARATION OF SUSAN
HALL IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT-3

route. In fact, I heard similar comments when I became a supervisor myself from Kent Ericken, the Postmaster, himself. I was totally amazed that he would make comments like "there, she goes again" and "she is always stirring things up" in reference to Rosa. There is no doubt in my mind that most of management generally saw Rosa as a disgruntled employee who was just using her medical situation to abuse the system. I did not hear those kinds of dismissing and demeaning comments made about guys, as indicated below, when they took time off or had problems on the job.

4. While I was a City Carrier, John Castillo had problems with his driver's license being revoked due to a legal issue. I understood he had been judged guilty of reckless endangerment but not DWI. As a result, Susan Johnson, a supervisor, and several other Craft employees had to drive him around to deliver the mail in order for him to receive his obligatory 6-8 daily hours of work that he was guaranteed under the union contract. This was from three to six months in my memory.

5. While I was a City Carrier downtown, I saw more than one major rant or temper tantrum from male employees in which they walked off the job in the middle of casing their mail and or left undelivered mail at

DECLARATION OF SUSAN
HALL IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT-4

the station and there were absolutely no disciplinary consequences that I ever was aware of. The individuals were John Castillo, Mike Pearson, and Scott Dornbirer. On other occasions, Brian Russell would want to leave early to go fishing or ask not to come in due to a "great catch", basically not complete his route due to non-emergency reasons and there was no opposition to that. Yet, there was no sympathy for the child care needs I had; it was basically very sexist decision-making while Ken Cikler was the carrier supervisor and it carried through and made it seem an acceptable practice. In fact, I had to cover other PTF carrier job assignments on occasion with little or no notice.

6. I will say that they did give me a partial route, i.e. 4-6 hours, and had me run Express Mail and other less strenuous assignments during my pregnancy. I would do a partial route called the South Douglas route which at that time was an auxiliary route. That was one of the assignments that I could see Rosa working on within her restrictions after her injury.

7. While I was a PTF Carrier at the Federal Building, I worked intermittently with Rosa Gaona. I was aware that she had experienced a slip and fall on the footbridge. I saw no reasonable, affirmative attempt by

DECLARATION OF SUSAN
HALL IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT-5

members of the management team, i.e., Ken Cikler, Carrier Supervisor, Dale Zwingleberg, Carrier Supervisor, or even Jim Donaghey and/or Kent Erickson, the Postmasters, to assist Rosa in performing within her restrictions or coming back to work in a limited duty assignment. Instead, I observed Rosa attempting to work her regular bid which I understood led her to reinjure herself. An injured employee was often treated as if they hurt themselves on purpose, this was the case in Rosa's situation. This is an example of the difference in treatment between men and women. It was very much a good old boys type of environment in my observation.

8.  As indicated above, the attitude towards Rosa was very negative because of her need for accommodation and I believe because she had filed EEOs The management comments about her "stirring things up" seemed like retaliatory comments to me. There was constant coworker griping that was basically ignored or condoned by management. Yet, there were also people like John Castillo who did make favorable comments about the quality of Rosa's work but always qualified it as before her injury.

DECLARATION OF SUSAN HALL IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT-6

9. At the time I worked at Mendenhall, and Rosa was working as a Custodian under my supervision, she initially was not working a full tour of duty, i.e. four to five hours of work, and with my approval, was working without taking lunch. She was technically a Carrier in this modified assignment so her clock rings were reported to her original duty station. At one point, I remember that Susan Johnson, the Station Manager, there raised some concern about Rosa's clock rings. Rosa was working through her breaks and/or lunches with my permission due to her working mostly 6 hours or less. Susan Johnson was well aware of the fact that Carriers like Stuart Akagi and John Castillo routinely worked through their lunches and breaks and they were not scrutinized for it. I remember that Rosa filed a grievance and obtained such evidence through clock rings as part of the grievance. I did not understand the whole basis for Susan Johnson's insistence that Rosa change her practice. It seemed like it was an unnecessary form of scrutiny to me but as her (Susan's) subordinate, I felt that I had to implement it. This was some time in the spring and/or summer of 2004. Susan treated me well and encouraged me to move into supervisory ranks but she was totally inflexible about this situation with Rosa.

DECLARATION OF SUSAN HALL IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT-7

10. I also recall during the period I worked as a Supervisor for Tour III at Mendenhall, that Ranae Davis was accommodated with a shift change because of a medical condition. I was not aware of how much effort she had to go through to obtain that consideration.

11. Overall, my experience with Rosa Gaona when she worked as a Custodian was that she had a strong work ethic and was always trying to do her job and did it well and to my satisfaction. From my observation and the training that I received in personnel and labor relations issues, I could not understand why I was being instructed to respect employees' rights on the one hand and yet, Rosa was continually labeled as a troublemaker for standing up for her rights as provided in her Union contract.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES THAT THE FORGOING IS TRUE AND CORRECT.

Dated at Juneau Alaska this 11th day of September 2006.

_____
SUSAN HALL

DECLARATION OF SUSAN HALL IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT-8