**LAW OFFICE OF PATRICIA S. ROSE**
Patricia S. Rose, WSBA #19046
Attorney for Plaintiff
157 Yesler Way, Suite 503
Seattle, Washington 98104
(206) 622-8964 (phone)
(206) 622-2593 (fax)
Email: prose83897@aol.com

UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | |
|---|---|
| ROSA S. GAONA<br><br>Plaintiff,<br><br>v.<br><br>JOHN E. POTTER,<br><br>Defendant. | No. CV 3:04-CV 00118-JKS<br><br>DECLARATION OF MARY E. JORDAN IN SUPPORT OF PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDAN'TS MOTION FOR SUMMARY JUDGMENT OF DISMISSAL |

I, MARY E. JORDAN, am over eighteen years of age and am competent to testify to the following. This statement is based on my personal knowledge and is true to the best of my recollection and belief.

DECLARATION OF MARY JORDAN
IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT-1

1. I am a former employee of the United States Postal Service in Juneau Alaska. I was hired as a part-time flexible (PTF) clerk in March 1993. After 90 days I was assigned the Personnel Clerk duties. The position was located outside the Postmaster's door. I performed various administrative duties related to human resources/personnel. This office area was located in a leased facility separate from all other postal facilities in Juneau.

2. I had been employed as a legal secretary for the City and Borough of Juneau's Attorney office. I took it upon myself to familiarize myself with the Employee Labor Relations Manual which is the basic resource for human resources/personnel management within the U. S. Postal Service. Early on in my position as personnel clerk, I faced some personal ethical challenges working with Postmaster James Donaghey. He would repeatedly make statements suggesting that we could ignore certain documents or requirements and/or pretend that we just did not receive them as a method for avoiding legal or compliance requirements. This would include such things as medical documentation or other communications such as those from the Unions. I specifically remember him saying this in the context of some medical restrictions or other information that I had received related to Wanda Temple, an employee who was having serious medical problems and was applying for disability retirement along with other assistance programs. He would also suggest that people "work better when they have been stirred up". When I asked him what he meant by this, he said "you

DECLARATION OF MARY E. JORDAN
IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT-2

know --do something you know will really upset them so they focus on each other". He stated that people work better when they are mad about something. I said I thought people were better motivated by respect along with some please and thank yous. We would butt heads on this issue for many years.

3. Because I flat out told him I could not live with myself if I did it his way, Postmaster Donaghey suggested that I go to the mail processing area at the Mendenhall facility and work there at night. Since I was a fast typist and very efficient in doing my personnel clerk duties, I could do them from 8 -10:30 AM after I completed a night tour in the mail processing area. I readily agreed as I did not feel morally right working near him. He arranged with the supervisor, Richard Derbesy, for me to work on Tour 1 which I did until I was able to bid on a mail process position. I was a single parent and I needed a job.

4. Ultimately, I bid and obtained a Window Clerk position at the Federal Building downtown. That was the first time that I met Rosa Gaona face to face. I have to admit that I had heard comments from Deborah Brockman, who was the timekeeper and is now currently HR person, as well as James Donaghey. During those earlier years, approximately between 1993 and 1995, he had said that Rosa was "nothing but trouble", that she was always "stirring up trouble" in his direction. He said his 'son-in-law, Stuart says "she can't do her job", i.e. that she is 'lazy' and 'can't do her route'" I had no reason to believe him but he definitely had major biases about her.

DECLARATION OF MARY E. JORDAN
IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT-3

5. When I met Rosa, she seemed pleasant and agreeable and not the terrible person that they had characterized her as. As part of my job, I did the Carrier check out and I saw no evidence that Rosa was not literally or figuratively carrying the same load as the other Carriers. I did hear comments during this time, which was when Don Fell was my supervisor, from other Carriers similar to those I had previously hear from James Donaghey. I hear Stuart himself state to me the same type of statements about Rosa's job performance. Besides myself, I only remember a handful of other female employees besides Rosa, i.e. Ranae Davis and another window clerk Andrea Aceveda.

6. Sometime during 1995, I became aware that Rosa had injured herself. I remember comments about her trying to scam the system, but I saw no evidence of that. She would be back at work and then out again on a regular pattern but I do remember receiving medical documentation information even when I filled in a supervisor. She certainly was not the only employee who had an on the job injury. The terrain in Juneau does make the City Carrier jobs particularly grueling for those doing walking routes therefore, back and knee injuries occurred regularly.

7. Griping about Rosa seemed to be the main topic of conversation and I would request them to "change the station" in a joking attempt to get them redirected to another topic, but it never lasted long. I know if I was Rosa that I would feel targeted and clearly not supported by management or coworkers at that

DECLARATION OF MARY E. JORDAN
IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT-4

time. I recall hearing Ron Ahrens and Stuart Akagi making statements like :"there she goes again" in reference to Rosa suggesting that she was trying to avoid work or scamming the system.

8.      Eventually, I bid back to the Mendenhall facility into a job as Bulk Mail Technician or Mail Requirements Clerk. I took the place of someone for whom Donaghey had arranged a Tour 2 job due to some problem which involved the Postal Inspectors. Donaghey was like that; if you were his friend or someone he liked, he would favor you and if you challenged his authority, he would immediately target you for discipline or otherwise harass people into quitting. I learned this from my own personal experience as described above.

9.      During the period that I was Bulk Mail Technician or Mail Requirements Clerk, in around 2001, I became Union President. I think it was approximately the time that Kent Eriksen became Postmaster as I could not handle dealing with Mr. Donaghey due to my first hand knowledge of his practices. I tried to engage in cooperative labor-management relations such as having Kent and I volunteer to be the object of a pie toss at a Union party. I was probably President from approximately 2001 to 2003.

10.     Obviously, with 9/11, it was a stressful time; there were many health and safety concerns, particularly the issues around Anthrax. Both Bud Keane, another active Union member, and I both were highly scrutinized and unfairly treated by management. For example, even though he was an electrician

DECLARATION OF MARY E. JORDAN
IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT-5

and I was the designated Health and Safety person very familiar with the standards, we both got written up separately for alleged safety violations. In my case, it was an electrical lamp that was not even plugged in as it had never worked and I used it for a hat rack. A coworker told me that I was about to get written up for that and I intervened before they had a chance.

11. However, in the period between 2002-2003, I was given a totally unjustified letter of warning for abandoning my position when I was threatened by Deborah Brockman that I had to provide the address of a person I was dating as my physical address. I had provided her with the address of my own home when, due in part to 9/11, we were all being required to update our addresses. However, she said she knew I was "sleeping with him"; therefore, I had to provide his address not my own. She told me I would not be allowed to continue to work until I completed a new change of address form which stated his address. Therefore, I left my position and clocked out as no supervisor or manager was in the facility at that time. The person I was seeing was in no way connected to the Post Office. He was going through a divorce and Deborah was in the same quilting club as the soon to be ex-wife. It was just petty vindictive behavior from my point of view.

12. I felt very vulnerable working alone because of the hostility of Deborah Brockman and Kent Eriksen chose to bid to a Window Clerk position in

DECLARATION OF MARY E. JORDAN
IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT-6

part so that there would be coworkers or customers to witness how they were treating me. Somewhat later, in 2003, I also bid into a General Expeditor job.

13. During my postal career, I began to have very serious health problems because of environmental hazards in my work area. I have severe chronic asthma and, therefore, had informally sought various reasonable accommodations that were often totally disregarded. For example, in 1998 to 1999, they were tearing out drywall in the work area and all the dust was a serious trigger for my asthma. I asked to be relocated. Instead, Ruth (Drake) Vincent provided me with a dust mask, but would not allow me to relocate. As a result of the severity of my symptoms, my doctor took me off work for three or four days after I had a severe asthma attack requiring an Emergency Room visit.

14. When I came back, I observed all my personal effects as well as work related equipment from my work area was in big postal bins as if they were purposefully discarded. Everything had been placed in the Rural Carrier garage. It was very hurtful. I learned from Monroe and John, the coworkers that had been ordered to move my stuff that this action been done specifically at James Donaghey's request. The environment was extremely cold and had high levels of exhaust that also exacerbated my breathing problems. I would begin wheezing and had to continually treat myself with the nebulizer and medication, I was able to somewhat manage it but it got steadily worse over a period of time. I

DECLARATION OF MARY E. JORDAN
IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT-7

called the individual overseeing the Bulk mail operation in Anchorage and asked her if she was aware of what had happened to the bulk mail requirements work area. Because of my ability to get her to intervene, management was forced to enclose the area and provide heat.

15. Each time I had an exacerbation of my disease, I would bring back some form of medical note and ask to be relocated or some form of accommodation. In a letter dated August 15th 2002 that I believe I provided to management medical information about my needs. No one referred me to any form of disability accommodation committee in Anchorage or other process and they basically ignored me.

16. In the fall of 2004, there was a stripper solvent used that triggered my asthma. I was treated medically but did not have any consideration from management despite doctor notes. There were fans pointing directly at me. I repeatedly asked them to not use that product or allow me to change work areas. It was like talking to a brick wall.

17. In 2000, on one occasion, there was a strong scent or fragrance that triggered my asthma. I began wheezing and having difficulty breathing and told them I would need to get medical intervention. I was told that if I did so, it would be considered abandoning my job. Dale Zwingleberg said something like "What are you trying to pull today?" as if I was faking the severe respiratory distress I

DECLARATION OF MARY E. JORDAN
IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT-8

was experiencing. The insensitivity of management was amazing. I could feel my lungs shutting down and called 911. I may have blacked out because the next thing that I recall specifically was that I was on a stretcher. Ruth Vincent followed the ambulance to the emergency room. She requested to meet with me to complete necessary postal forms. I think that I missed approximately 10 days. They were still unwilling to relocate my work station.

18. Ultimately, as indicated above, I bid to a general expeditor job. While there, there was another instance of use of a stripper solvent and again I sought medical attention. Again, my primary physician wrote a note and asked for reasonable accommodation for my asthma and no action was taken. Throughout the fall of 2005, the continual use of fragrances, industrial solvents and other cleaners led to an increasing numbers of asthma attacks. At one point, when I made management again aware about the fragrances being a trigger, I asked for a sign to be posted so that people in my immediate work area could remove it or abstain from using if they had to interact with me. They refused to do that and Kent Eriksen, who was then Postmaster, made some reference that he would "wear double the amount of cologne" instead if it irritated certain people." The insensitivity was shocking to me especially in light of the fact that Deborah Brockman, the Personnel Clerk, suffered from migraines and had similar sensitivities. They bent over backwards to change her work area and to eliminate

DECLARATION OF MARY E. JORDAN
IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT-9

1 irritants which might cause her medical problems. I solicited from my doctor and
2 gave a letter to the USPS during this period, i.e. November 2005.

3
4  19.    Finally, in late December of 2005, I had a severe attack at work
5 that led me to taken by ambulance to the hospital and ultimately MEDIVACed to
6 Seattle's Virginia Mason Hospital. I was ultimately treated in Denver at the
7 National Jewish Medical and Research' Center's environmental and occupational
8 disease specialists. I have not worked since and have been awarded disability
9 retirement.
10
11  20.    In all of the time I worked for the Postal Service, I observed
12 repeatedly how the local management targeted individuals who they saw as
13 troublemakers. I am sure that I was one of them because of my status as union
14 activist and refusal to support unethical if not illegal actions with respect to
15 management's treatment of employees. The difference between how management
16 treated Bud and I along with how Deborah's medical problems were treated are
17
18 just examples of this pattern. The attitude and actions that I observed that were
19 taken vis a vis Rosa Gaona were consistent with this overall mindset.
20
   I SWEAR UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE
21 UNITED STATES THAT THE FOREGOING STATEMENT IS TRUE AND
   CORRECT.
22
   Dated at Juneau Alaska this 13 day of November 2006
23
24 _____
                     MARY E. JORDAN
25 DECLARATION OF MARY E. JORDAN
   IN SUPPORT OF PLAINTIFF'S
26 OPPOSITION TO DEFENDANT'S
   MOTION FOR SUMMARY JUDGMENT-10