1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**LAW OFFICE OF PATRICIA S. ROSE**
Patricia S. Rose, WSBA #19046
Attorney for Plaintiff
157 Yesler Way, Suite 503
Seattle, Washington 98104
(206) 622-8964 (phone)
(206) 622-2593 (fax)
Email: prose83897@aol.com

UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

ROSA S. GAONA

Plaintiff,

v.

JOHN E. POTTER,

Defendant.

No. CV 3:04-CV 00118-JKS

DECLARATION OF
PATRICIA S. ROSE
 IN SUPPORT OF
PLAINTIFF'S  MEMORANDUM
IN OPPOSITION TO
DEFENDAN'TS MOTION FOR
SUMMARY JUDGMENT OF
 DISMISSAL

I, Patricia S. Rose, am over eighteen years of age and am competent to testify to the following

statement.   This declaration is based on my personal knowledge.

DECLARATION OF COUNSEL
IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT-1

1     1.     Exhibit A to this declaration is a true and correct copy of a Proposed Third Amended

2  Complaint for Damages and Other Relief.

3     2.     Exhibit B to this declaration are true and correct excerpts from the deposition

4  transcript of plaintiff taken in September 2005.

5

6     3.     Exhibit C to this declaration is a true and correct copy of an email from counsel for the

7  defendant to my self.

8     5.     Following the discovery cut-off, my client was able to locate James

9  Kammermeyer, former Labor Relations Representative of defendant in Juneau Alaska.

10  He is currently serving in a similar capacity for an agency in the Executive Branch of the

11  United States government.  He requested to confer with counsel for defendant before

12  speaking to me and I agreed that he could do so. Afterwards, he indicated that it was his

13  understanding that as formal discovery had closed, he was under no obligation to

14  voluntarily speak with me and preferred to testify following a court order to do so if

15

16  necessary.

17  I SWEAR UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED
STATES THAT THE FOREGOING STATEMENT IS TRUE AND CORRECT TO
18  THE BEST OF MY KNOWLEDGE.

19     Dated this 13th day of November 2006.

20

21          PATRICIA S. ROSE

22

23

24

25  DECLARATION OF COUNSEL
IN SUPPORT OF PLAINTIFF'S
26  OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT-2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**LAW OFFICE OF PATRICIA S. ROSE**
Patricia S. Rose, WSBA #19046
Attorney for Plaintiff
157 Yesler Way, Suite 503
Seattle, Washington 98104
(206) 622-8964 (phone)
(206) 622-2593 (fax)
Email: prose83897@aol.com

# UNITED STATES DISTRICT COURT

## DISTRICT OF ALASKA

| | |
|---|---|
| ROSA S. GAONA<br><br>                 Plaintiff,<br><br>        v.<br><br>JOHN E. POTTER,<br>                Defendant. | No. CV 3:04-CV 00118-JKS<br><br>PLAINTIFF'S THIRD AMENDED COMPLAINT TO CONFORM TO EVIDENCE |

COMES NOW, the Plaintiff, by and through her undersigned attorney, and alleges the following facts and causes of action:

## I. PARTIES

1.1    Plaintiff, Rosa Seabreeze Gaona, hereinafter "Plaintiff", is an individual and at all times relevant to this cause of action was a resident of Juneau Alaska.

PLAINTIFF'S THIRD AMENDED
COMPLAINT TO CONFORM
TO EVIDENCE-1

LAW OFFICE OF PATRICIA S. ROSE
157 Yesler Way, Suite 503
Seattle Washington 98104
206) 622-8964 (phone) (206 ) 622-2593fax)

EXHIBIT NO. _A_

1.2    Defendant, James E. Potter, at most times relevant to this complaint was the Postmaster

General of the United States and a duly authorized agent of the United States Postal Service

(hereinafter "USPS") and is the designated agent  to be sued for all omissions and actions alleged

herein

## II. JURISDICTION AND VENUE

2.1    The above-referenced Court has subject matter and personal jurisdiction of the actions

alleged herein and the parties hereto under the authority of 28 U.S.C. §§1331, 1343 and 42

U.S.C. § 2000e-16.

2.2    The above-referenced Court is presently the proper venue for this action.

2.3    The Plaintiff has complied with necessary administrative claim filings with the United

States Postal Service and/or the Office of Federal Operations of the Equal Employment

Opportunity Commission under 29 C.F.R. §§ 1614 *et seq.*  The Plaintiff has received

correspondence indicating her Right to Sue on multiple occasions and specifically on or about

the following dates:  March 21, 2005, April 27, 2005, and June 13, 2005, among others...

2.4    This claim includes causes of action alleging damages compensable under federal

statutes such as the Civil Rights Act of 1991 and the Americans With Disabilities Act and

Rehabilitation Acts .

2.5    The Plaintiff demands a 12-person jury.

## III.    FACTUAL ALLEGATIONS

3.1    Rosa S. Gaona was first employed by defendant as a Letter Carrier in March of 1986.

After training and satisfactory completion of her probationary period, she successfully performed

PLAINTIFF'S THIRD AMENDED
COMPLAINT TO CONFORM
TO EVIDENCE-2

LAW OFFICE OF PATRICIA S. ROSE
157 Yesler Way, Suite 503
Seattle Washington 98104
206) 622-8964 (phone) (206 ) 622-2593fax)

her work through bid assignments on routes based at the Federal Building station in Juneau Alaska.

3.2     She is of mixed Hispanic and Native descent and also was active in the Juneau Branch of the National Association of Letter Carriers, the labor organization that governed her employment. She served as its President from approximately 1993 to 1995.

3.3     In 1992, she first filed and substantially prevailed in a formal complaint of employment discrimination against agents of the defendant including her employer's attempt to discharge her without justification.

3.4     In addition to her protected activity on this EEO complaint, she also vocally supported the rank and file employees in forwarding grievances to management regarding working conditions including inappropriate actions by a fellow Union member and intermittent acting supervisor, Stuart Akagi, who was then Postmaster Donaghey's son-in-law.

3.5     As a result of her race, gender and ethnicity, as well as protected conduct, both coworkers and supervisors and managers of defendant were permitted to engage in adverse actions and derogatory conduct directed at Plaintiff with the knowledge of management including Postmaster Donaghey who did not take action to prevent the conduct from occurring.

3.6     Throughout the period from 1992 to 1995, the hostile working environment engendered by the hostility of Stuart Akagi and James Donaghey, among others, continued and no action was taken to enforce any corrective action.

3.7     On or about October 30 1995, Plaintiff injured herself as a result of falling on a walk way en route from a parking lot to the Federal Building. As a result of the fall, she suffered a

PLAINTIFF'S THIRD AMENDED
COMPLAINT TO CONFORM
TO EVIDENCE-3

LAW OFFICE OF PATRICIA S. ROSE
157 Yesler Way, Suite 503
Seattle Washington 98104
206) 622-8964 (phone) (206 ) 622-2593fax)

1   disabling back injury that was initially diagnosed as a lumbar strain and ultimately diagnosed as

2   myofascial pain syndrome

3   3.8    Because of the extent of her injury, Plaintiff immediately sought medical care and was

4   instructed to take medical leave and did so until December 11, 1995 when she returned on a

5   reduced schedule and with restrictions. She worked  intermittently in limited duty and/or light

6   duty assignments from that date until September of 2002. As a result of various exacerbations of

7   her original injury because of work requirements that exceeded her restrictions, she applied for

8

9   and received federal workers' compensation benefits intermittently as well.

10  3.9    . During the period from 1995 to 2002,  Plaintiff attempted on multiple occasions to

11  return to work with defendant within the medical restrictions she was given by her treating

12  physicians and was repeatedly rebuffed in her efforts to do so. On occasions when she did return,

13
    she was required to work outside of her restrictions causing further injury.
14

15  3.10    At one point after returning to work, an incident occurred in September 1999 wherein

16  Stuart Akagi threatened her job security and stated that he would see that she was terminated.

17  Soon thereafter, she was charged with being absent without leave without justification and

18  suspended when employees with similar attendance patterns who took unscheduled leave for

19  personal needs were not scrutinized or disciplined in this fashion.

20  3.11    During the period from 1997 to 2004, agents of the Postal Service repeated made

21
    derogatory remarks about Plaintiff to one another and in the presence of her coworkers indicating
22
23  that she was a "problem" employee, a "troublemaker", "nothing but trouble" and "trying to stir

24  things up"  and that management was attempting to remove her from employment.

25

26  PLAINTIFF'S THIRD AMENDED                    LAW OFFICE OF PATRICIA S. ROSE
    COMPLAINT TO CONFORM                              157 Yesler Way, Suite 503
    TO EVIDENCE-4                                     Seattle Washington 98104
                                               206) 622-8964 (phone) (206 ) 622-2593fax)

3.12   As a result of the hostility directed at her and the threat to Plaintiff's job security, Plaintiff developed disabling depression and anxiety and ultimately in 2002 was diagnosed with Post-traumatic stress disorder (PTSD) after the Union President, Chris Dargan, indicated that he wanted to see her fired..

3.13   In 1999, with the intervention of the State of Alaska Department of Vocational Rehabilitation, Plaintiff negotiated a mediated resolution that would have permitted her to return to work with reasonable accommodations for her physical and mental disabilities including use of two bundle casing system that had been provided to similarly situated employees with medical restrictions. .

3.14   In 2000, Postmaster Donaghey instructed Ken Cickler to remove the accommodations provided to Plaintiff in the presence of Union President Chris Dargan who did not intervene or attempt to represent Plaintiff on her concerns as to being forced to work outside of her medical restrictions. Between 1999 and 2002, Plaintiff was not afforded opportunities to work within the Carrier craft on numerous occasions and instead was provided light duty work in the Clerk craft while Part-time Flexible Carries were provided such opportunities. As a result, she was absent for an extended period from September 10, 2002 until the spring of 2004,

3.15   Beginning in 2003, Plaintiff understood that she her physicians were prepared to release her to return to work as a Carrier albeit with restrictions due to her continuing mental and physical impairments. Despite her physician's certification that she could generally return to work as a City Carrier as long as she was not required to report at the Juneau Federal Building location, agents of defendant made no affirmative efforts to assist in her obtaining a work

PLAINTIFF'S THIRD AMENDED
COMPLAINT TO CONFORM
TO EVIDENCE-5

LAW OFFICE OF PATRICIA S. ROSE
157 Yesler Way, Suite 503
Seattle Washington 98104
206) 622-8964 (phone) (206 ) 622-2593fax)

1    assignment outside of that location or that would fit within these restrictions. On her own

2    initiative, Plaintiff explored the possibility of performing a limited duty assignment on a portion

3    of the Route 10 / Douglas route. She later learned that the position had been awarded by bid to a

4    less senior employee, Chris Darden  During this period, she also began interactions with

5    defendant's Reasonable Accommodation Committee and Occupational Health staff in

6    Anchorage Alaska to provide information that would facilitate her return to work.  Throughout

7    2003, she provided medical information from such health providers as Drs Schultz, Stillner, and

8    Ellis who supported the Douglas route assignment as a reasonable accommodation and within

9    

10   her restrictions.

11   3.16    Instead of engaging in the interactive process required by law, on or about February 4,

12   2004,  agents of defendant inexplicably concluded that Plaintiff did not meet the criteria for

13   reasonable accommodation as defined in the Rehabilitation Act.   Management officials of the

14   defendant subsequently took action on or about March 3, 2004, to remove plaintiff from her

15   career permanently by asserting that she was unable to perform her position responsibilities due

16   

17   to her disabilities.

18   3.17    Only after a grievance under her collective bargaining agreement and intervention by the

19   regional officers of her labor organization in cooperation with the efforts of private counsel

20   through EEO complaints regarding the agency's failure to accommodate plaintiff's disability was

21   the separation rescinded.  Ultimately, plaintiff was placed in a limited duty assignment in the

22   Clerk craft as a Custodian at defendant's Mendenhall facility effective late April of 2004.

23   

24   

25   

26   PLAINTIFF'S THIRD AMENDED
     COMPLAINT TO CONFORM
     TO EVIDENCE-6

LAW OFFICE OF PATRICIA S. ROSE
157 Yesler Way, Suite 503
Seattle Washington 98104
206) 622-8964 (phone) (206 ) 622-2593fax)

3.18    Throughout the period from late April 2004 to her separation date in 2005, various agents of the defendant continued to scrutinize Plaintiff's behavior in a manner unlike that of her coworkers.  For example, she was scrutinized for her rwillingness to work a limited tour without a lunch break while similarly situated employees on eight hour tours worked through their lunches without such scrutiny.

3.19    Despite the unwelcome conduct and scrutiny of her work performance by management Plaintiff was able to successfully perform the essential functions of her modified duty assignment as a Maintenance Custodian and had positive work relationships with her immediate supervisors.

3.20    On or about May 10, 2005, Plaintiff learned that she would be supervised at Mendenhall by Dailang Seceda, one of the supervisors who had been assigned to the Juneau Federal Building and who had been part of the hostile work environment that she experienced there. Because she understood that her physicians recommended that she have no supervision or oversight by those individuals, she perceived the action to be a continued attempt to undermine her successful return to work and raised concerns about this assignment with her local management.

3.21    As a result, she filed an additional EEO complaint with agents of the defendant.  When that complaint was not remedied or investigated in a timely basis, she felt no other choice but to resign her employment rather than face the same form of hostility and subsequent mental heath consequences that she had experienced in the past. .

3.22    Throughout there period before and after her return to work and final separation from the United States Postal Service, Plaintiff has undergone mental health treatment and vocational

PLAINTIFF'S THIRD AMENDED
COMPLAINT TO CONFORM
TO EVIDENCE-7

LAW OFFICE OF PATRICIA S. ROSE
157 Yesler Way, Suite 503
Seattle Washington 98104
206) 622-8964 (phone) (206 ) 622-2593fax)

counseling as a result of the improper and illegal conduct committed by the Defendant in this case. Plaintiff terminated her own employment because of these events and has been constructively wrongfully terminated by the Defendant as a result of the cumulative effect of the discriminatory and retaliatory conduct that she experience whiled employed at the United States Postal Service.

3.23     The conduct of these Defendants caused plaintiff to suffer, humiliation, anxiety, depression, and caused her to be subjected to an intimidating, hostile and offensive work environment and to be discriminated against on the basis of race, gender and disability as well as to be retaliated against because of her continuing use of her collective bargaining agreement's grievance procedure and/or federal EEO procedures to investigate and or seek remedies for these issues.

### IV. CAUSE OF ACTION NO. 1:  UNLAWFUL RETALIATION AND HOSTILE WORK ENVIRONMENT UNDER §704(a) of THE CIVIL RIGHTS ACT OF 1964 AS AMENDED BY THE CIVIL RIGHTS OF 1991

4.1     Paragraphs 1.1 to 3.23 is realigned as if fully set forth herein.

4.2     From 1992 to her separation from employment, Plaintiff engaged in protected conduct and activities under section 704(a) of the Civil Rights Act of 1964.

4.3     During this time, agents of defendants engaged in various acts of retaliation towards Plaintiff due to her protected conduct, including but not limited to denial of administrative leave, leave without pay and other leave necessary to treat her mental health and physical health conditions, rejection of medical certifications and other unwillingness to engage in reasonable accommodation efforts, refusal to assign work within her craft,  threatened removal from

PLAINTIFF'S THIRD AMENDED
COMPLAINT TO CONFORM
TO EVIDENCE-8

1  employment, assignment to supervisors against health care providers' recommendations, among

2  others, all of which created a hostile work environment for Plaintiff.

3  **V.    CAUSE OF ACTION NO. 2:  HOSTILE WORK ENVIRONMENT DUE TO**
4  **DISABILTY IN VIOLATION OF THE REHABILITATION ACT AND  42 USC § 12112,**
   **THE AMERICANS WITH DISABILITIES ACT**

5  5.1    Paragraphs 1. 1 to 4.3 are realleged as if fully set forth herein.
6
7  5.2    Plaintiff is a qualified person with disabilities entitled to protection from discrimination

8  under the Rehabilitation Act and the Americans With Disabilities Act.

9  5.3    Agents of defendant deliberately repeatedly failed to take affirmative measures to assist

10  Plaintiff in performing the essential functions of her position, or any other position with the

11  defendant, with or without reasonable accommodations, which created a hostile work

12  environment for Plaintiff, due to her disabilities.

13
14  5.4    Agents of defendant retaliated against Plaintiff due to her vigorous attempts to seek

15  reasonable accommodation for physical and medical conditions she and they regarded as

16  disabilities in violation of the Rehabilitation Act and  42 USC § 12203 of the Americans With

17  Disabilities Act.

18  **VI.  CAUSE OF ACTION NO. 3:  HOSTILE WORK ENVIRONMENT DUE TO**
19  **GENDER IN VIOLATION OF §703(a) OF THE CIVIL RIGHTS ACT OF  1964, AS**
   **AMENDED BY THE CIVIL RIGHTS ACT OF 1991**

20  6.1    Paragraphs 1.1 to 5.4 are realleged as if fully set forth herein.
21
22  6.2    Plaintiff was subject ed to hostile and degrading comments about he performance as a \c

23  City Carrier because of her gender and because she did not conform to defendant's stereotyped e

24  expectations as to the capabilities of female employees.

25

26  PLAINTIFF'S THIRD AMENDED
   COMPLAINT TO CONFORM
   TO EVIDENCE-9

LAW OFFICE OF PATRICIA S. ROSE
157 Yesler Way, Suite 503
Seattle Washington 98104
206) 622-8964 (phone) (206 ) 622-2593fax)

6.3    Agents of defendant engaged in this unwelcome conduct that was directed at Plaintiff but also was directed at other female employees because of their gender, in violation of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991.

## VII. CAUSE OF ACTION NO. 5:  CONSTRUCTIVE DISCHARGE & DISPARATE TREAMENT IN THE TERMS AND CONDITIONS OF EMPLOYMENT DUE TO RETALIATION, DISABILITY, AND GENDER

7.1    Paragraphs 1.1 to 6.2 are realleged as if fully set forth herein.

7.2    Agents of defendant made Plaintiff's working conditions so intolerable that a reasonable person in her circumstances would resign her employment.

7.3    Defendant's actions were a constructive discharge of Plaintiff's employment and were motivated by her gender, protected conduct and/or disability.

## VIII. DAMAGES

8.1    Paragraphs 1.1 to 7.3 are realigned as if fully set forth herein.

8.2    As a direct and proximate cause of the conduct and violations of law identified in each of Plaintiff's stated causes of action, Plaintiff has suffered, and continues to suffer pecuniary losses, including loss of past and future wages, health and welfare benefits, and other economic advantages of employment, in an amount to be determined at trial.

8.3    As a direct and proximate cause of the conduct and violations of law identified in Plaintiff's stated cause of actions, Plaintiff has also suffered, and continues to suffer, general damages, including, but not limited to, emotional distress, humiliation, mental anguish, pain and suffering, and embarrassment, each in an amount to be proved at trial.

PLAINTIFF'S THIRD AMENDED
COMPLAINT TO CONFORM
TO EVIDENCE-10

LAW OFFICE OF PATRICIA S. ROSE
157 Yesler Way, Suite 503
Seattle Washington 98104
206) 622-8964 (phone) (206 ) 622-2593fax)

8.4    As a direct and proximate cause of the conduct and violations of law identified in each of Plaintiff's stated causes of action, the Plaintiff has suffered, and continues to suffer, special damages in the form of job search, expanded commuting expenses and other losses, each in an amount to be proved at trial.

## IX.    PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays that the Court issue judgment in her favor and order the following relief:

1.    Order that Defendant immediately reinstate Plaintiff to a position for which she qualifies;

2.    Order that defendant is liable to Plaintiff for all pecuniary losses incurred by her to date, and projected to be incurred by her, including, but not limited to, loss of earnings, front and back pay, health and welfare benefits, and any other pecuniary advantage of employment, the loss of which was directly or proximately caused by defendants' unlawful practices, each in an amount to be proved at trial.

3.    Order that defendants are liable to Plaintiff for all non-pecuniary and intangible damages, directly or proximately caused by defendants' unlawful conduct, including, but not limited to, emotional distress, humiliation, mental anguish, pain and suffering, and embarrassment, as authorized by 42 USC §§ in an amount to be proved at trial.

4.    Order that defendants are liable for all of Plaintiff's special damages, including job search expenses, additional commuting expenses and other pecuniary losses proximately caused by defendant's' unlawful conduct.;

PLAINTIFF'S THIRD AMENDED
COMPLAINT TO CONFORM
TO EVIDENCE-11

LAW OFFICE OF PATRICIA S. ROSE
157 Yesler Way, Suite 503
Seattle Washington 98104
206) 622-8964 (phone) (206 ) 622-2593fax)

5.    Order that defendant compensate plaintiff for her litigation costs and reasonable attorneys' fees incurred as a result of defendant's unlawful conduct, as authorized by 42 U.S.C. § 12205 and 42 U.S.C. §20000e-5(k); and

6.    Order such other relief as the Court deems just and appropriate.

Respectfully submitted this _2nd_ day of November 2006.

LAW OFFICE OF PATRICIA S. ROSE

_Patricia S. Rose_

Patricia S. Rose, WSBA #19046
Attorney for Plaintiff

## VERIFICATION

I, Rosa Seabreeze Gaone, am the Plaintiff in the abvove-captioned matter. I have reviewed the above-referenced factual recital and complaint for damages and do declare under penalty of perjury under the laws of the United States that I believe it to be true and correct to the best of my knowledge and belief.

Dated this 2nd day of November 2006 at Juneau Alaska

_Rosa Seabreeze Gaona_

ROSA SEABREEZE GAONA

PLAINTIFF'S THIRD AMENDED
COMPLAINT TO CONFORM
TO EVIDENCE-12

LAW OFFICE OF PATRICIA S. ROSE
157 Yesler Way, Suite 503
Seattle Washington 98104
206) 622-8964 (phone) (206) 622-2593fax)

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

ROSA GAONA,                          )
                                     )
            Plaintiff,               )
                                     )
v.                                   )
                                     )
JOHN E. POTTER,                      )
Postmaster General,                  )
                                     )
            Defendant.               )
_____  )

Case No. A04-114 CV (JKS)


DEPOSITION OF ROSA GAONA

Pages 1 through 153, Inclusive

Taken: Tuesday, September 20, 2005

Place: Juneau, Alaska


**EXHIBIT NO.** _B_

Rosa Gaona * 9/20/2005
Gaona v. Potter * A04-114 CV (JKS)

Page 2

1    Deposition of ROSA GAONA

2

3

4                    INDEX OF EXAMINATIONS

5                                              PAGE

6

7    Examination by Mr. Pomeroy                  4

8

9

10                    INDEX OF EXHIBITS

11   NO.                                        PAGE

12   Exhibit 1   Seconded Amended Employment     40

13              Discrimination Complaint

14

15

16

17

18

19

20

21

22

23

24

25

Rosa Gaona * 9/20/2005
Gaona v. Potter * A04-114 CV (JKS)

Page 3

1   A P P E A R A N C E S:
2     For the Plaintiff:   LAW OFFICE OF PATRICIA S. ROSE
           Patricia S. Rose, Esq.
3           157 Yesler Way, Ste. 503
           Seattle, WA 98104
4
5     For the Defendant:   U.S. ATTORNEY'S OFFICE
           Richard L. Pomeroy, Esq.
6           222 West 7th Ave. #9, Rm. 253
           Anchorage, AK 99513-7567
7
8           U.S. POSTAL SERVICE LAW DEPT.
           Leigh Kertamus Bonds, Esq.
9           9350 South 150 East, Ste. 800
           Sandy, UT 84070-2701
10
11
12     BE IT REMEMBERED that, pursuant to Amended
13   Notice of Deposition, and beginning on Tuesday, the
14   20th day of September, 2005, commencing at the hour
15   of 9:00 a.m. thereof, in the Aspen Hotel, Shell
16   Simmons Suite, located at 1800 Shell Simmons Drive,
17   Juneau, Alaska, before me, LYNDA BATCHELOR BARKER,
18   Registered Diplomate Reporter and Notary Public in
19   and for the State of Alaska, personally appeared:
20
21           ROSA GAONA
22
23   Called as a witness by the Defendant, who was
24   thereafter examined and interrogated as hereinafter
25   set forth.

Page 4

1           TUESDAY, SEPTEMBER 20, 2005
2               JUNEAU, ALASKA
3               9:00 A.M.
4
5           THE REPORTER:  Would you raise your
6   right hand for me, please?
7           (Oath administered)
8           THE WITNESS:  Yes.
9
10           ROSA GAONA
11
12   having been first duly sworn by the court reporter to
13   tell the truth, the whole truth, and nothing but the
14   truth, testified as follows:
15
16           EXAMINATION
17
18   BY MR. POMEROY:
19     Q.   Just for the record, please state your
20   name.
21     A.   Rosa S. Gaona.
22     Q.   And what does the "S" stand for?
23     A.   Seabreeze.
24     Q.   And you have testified in administrative
25   hearing before, and I think you have had an

Page 5

1   administrative deposition taken; is that correct?
2     A.   **I'm not sure what you are asking. You**
3   **are asking two different questions.**
4     Q.   You have testified at an administrative
5   hearing before, correct?
6     A.   **With Judge Carroll.**
7     Q.   Yes.
8     A.   **Yes.**
9     Q.   And you had, I think, an administrative
10   deposition with Bill Fund?
11     A.   **Yes.**
12     Q.   And did you provide testimony in any
13   other agency hearings?
14     A.   **1991.**
15     Q.   Okay.  Have you ever testified at trial
16   in state or federal court?
17     A.   **No.**
18     Q.   Have you ever had your deposition taken,
19   such as we are doing today?
20     A.   **No.**
21     Q.   So let me give you a few ground rules.
22   This is merely just questions and answers.  If you
23   don't understand the question, please ask me to
24   restate it.  I don't want you guessing at what I was
25   asking you.

Page 6

1           Second, unlike your attorney, I
2   tend to speak slowly. I'm from the Midwest. I'm
3   getting old.  So I ask you to let me finish the
4   question before you respond.  90 percent of the
5   time, you know where I'm going, but if you have read
6   the administrative record, you can see where, when
7   people talk over each other, the record becomes
8   choppy, and it is difficult for us subsequently to
9   read and use.  It also makes the court reporter's
10   job more difficult.  So for everybody's benefit,
11   please let me ask or finish the question before you
12   answer.
13           Third, because this is being
14   transcribed, you need to answer with yes or no,
15   rather than visual, you know, nods of the head or
16   shakes of the head.  Is that clear?
17     A.   **Yes.**
18     Q.   Great.  You were born February 8, 1954;
19   is that correct?
20     A.   **Yes.**
21     Q.   Where?
22     A.   **Seattle, Washington.**
23     Q.   And are your mother and father still
24   alive?
25     A.   **My father is still alive.**

3 (Pages 3 to 6)

Rosa Gaona * 9/20/2005
Gaona v. Potter * A04-114 CV (JKS)

Page 131

1   A.   They have a lot of supervisors.
2   Q.   Okay. Well, you said work around
3   anybody who was involved?
4       A.   Nobody in Mendenhall station —
5   Q.   Or just to supervise?
6       A.   Well, who was a postal employee?
7   Q.   That was my question.
8       A.   Managers, supervisors, employees, letter
9   carriers. Postal employees, that's everybody.
10   Q.   Yes.
11      A.   Right. So what are you asking?
12   Q.   Okay. Well, let's go back to my
13   question that you didn't answer. Where was this
14   agreement?
15      A.   The first agreement was made with the
16   union when the union from Anchorage came down and we
17   were figuring out this job about the custodial;
18   because we knew I couldn't carry mail downstairs as
19   a letter carrier, because of all the hostile stuff
20   that was — that had gone on and would probably
21   continue to go on.
22   Q.   Do you mean downtown, not downstairs?
23      A.   Yeah. No, downtown at the Federal
24   Building.
25   Q.   Okay. You said "downstairs," so I

Page 132

1   thought there was another disability aspect to your
2   claim.
3       A.   No. I'm sorry. I'm thinking about the
4   meeting because we were upstairs in the Federal
5   Building, and —
6   Q.   That's okay. We have been going for
7   five or six hours. It's —
8       A.   That agreement was made with Susan
9   Johnson and Mr. — the union guy that came down from
10   Anchorage. Mr. — that's why they gave me the
11   custodial job, because I'd be out at Mendenhall away
12   from the postal employees —
13   Q.   The downtown people?
14      A.   — from the Federal Building. Exactly.
15   Q.   Was there anything in writing that
16   reflects this?
17      A.   Yes. The union has documentation, and
18   also the doctor does, too, because they were also
19   involved in getting this to work so that I could go
20   back to work.
21   Q.   And which doctor was this?
22      A.   I believe it was Dr. Stillner.
23   Q.   Okay.
24          MS. ROSE: Is the question, "Do the
25   doctors have copies of this agreement"?

Page 133

1          MR. POMEROY: I haven't asked if
2   the doctors have copies of this agreement, no.
3          MS. ROSE: Well, that sounded like
4   what you asked. What did you ask? It seems like
5   you asked —
6          MR. POMEROY: I asked if she had a
7   copy of this agreement, and she said the union did.
8          MS. ROSE: Right. And —
9          MR. POMEROY: And then she
10   mentioned the doctors were involved in the
11   negotiation. But there was no question about
12   whether the doctors had —
13          MS. ROSE: Okay. I just wanted to
14   make sure the record was clear. It wasn't clear to
15   me.
16   BY MR. POMEROY:
17   Q.   And when was this agreement arrived at?
18      A.   Negotiated? It was negotiated, I
19   believe, in March of 2004. The union from
20   Anchorage, Susan Johnson, and I believe Kent
21   Erickson was involved too. Of course I never did —
22   Susan Johnson and the union and I were in a meeting
23   to negotiate this job for custodial. And it was
24   negotiated with the understanding that I would not
25   work around past employees involved in the EEOC.

Page 134

1   Q.   And then when Dilang Saceda was adjusted
2   into your work time slot, did you file — as I
3   understand, you filed an EEO complaint?
4       A.   Yes.
5   Q.   Okay. And what was the complaint?
6       A.   I was walking by a coworker. He asked
7   me a question about something. I think he asked me
8   when I was going to move over to mail processing or
9   something. And I laughed. And as I was talking to
10   him, I was walking along, and the next thing I know,
11   Dilang Saceda rushes up beside me, right up
12   against — I mean, just like that (indicating), and
13   I'm like, "What's going" — you know, I'm thinking
14   in my head, "What is she doing?"
15          And I said to Steve, as I'm looking
16   in the tub of mail that he's working out of, that
17   there is about an inch of sand in the tub of — the
18   tub that he's working out of. And Dilang Saceda is
19   right up against my body (indicating), practically
20   shoving me over.
21   Q.   She hit you?
22      A.   No, but, I mean, you know —
23   Q.   She pushed you?
24      A.   Well, no. But she was like right up
25   against me. I mean, like —

35 (Pages 131 to 134)

Rosa Gaona * 9/20/2005
Gaona v. Potter * A04-114 CV (JKS)

Page 135

1    Q.    Was she making contact with you?
2    A.    Yes. And she was, like, listening to
3  what we were saying. And so I said to him, as I'm
4  passing by, "You need to let me vacuum that out when
5  you are done because the sand in there is -- you
6  know, let me vacuum out the sand." And Dilang
7  yelled "No," like that. And she scared the living
8  hell out of me and the guy I was talking to.
9    Q.    And who was it you were talking to?
10   A.    Steve Eschenhau.
11   Q.    Okay.
12   A.    And I was like -- so I just kind of, you
13  know, went about my business, and I thought "Okay."
14       So after that little thing, Steve
15  brought me the tub, and I vacuumed it out, and I
16  brought it back to him. And Dilang Saceda was
17  watching me like, you know, "What are you doing?"
18  And so I went up to explain to her that I was
19  vacuuming out the tub for Mr. Eschenhau, and she
20  said --
21   Q.    Had she asked you what you were doing?
22   A.    Well, no. But she was watching me, you
23  know, like, "What are you" -- you know. And so, to
24  be respectful, I went to Dilang and explained to her
25  that I realized she told me, no, not to vacuum out

Page 136

1  the tub, but I did it anyway. And she said, "I
2  don't care what you do. You just keep doing your
3  job."
4       And so, I mean, from that point on,
5  it was -- you know -- she doesn't talk to anybody
6  else like that. So I just -- I left early. I left
7  work early because I didn't want to -- I didn't want
8  to have any more confrontation with the woman.
9    Q.    Okay. And so that was sick leave or
10  annual leave or --
11   A.    I don't know. I think I took leave
12  without pay.
13   Q.    Okay. And how long were you gone?
14   A.    About a month. And -- I think it was
15  about a month. I could be wrong, but the union got
16  involved, the clerk union got involved, and they --
17  we asked -- this is what I wanted, because I didn't
18  want to have any more confrontations with Dilang
19  Saceda -- is that I come to work at 1:00 in the
20  morning, because I didn't want -- you know, I just
21  wanted to keep working nicely, as things have been
22  for the year. And so I suggested to the union to
23  ask Ruth Drake if they could please bring me in at
24  1:00 in the morning so that I wouldn't have to deal
25  with Dilang and Dilang wouldn't have to deal with

Page 137

1  me. And they refused.
2    Q.    Okay.
3    A.    So we asked them why, and I can't
4  exactly remember what the reasoning was. Edwin
5  would know more about that than I.
6       Anyway, I didn't go back to work
7  for a while longer, and I think Edwin Soto had
8  talked to them some more. And for some reason, they
9  designed to bring me in in the mornings.
10       So I started at 6:00 -- was it
11  6:00? Yes, 6:00 in the morning. So there was two
12  of us custodial people on at that time in the
13  morning, and I couldn't figure out -- well, it is
14  not for me to know what they are doing. But . . .
15   Q.    So is the normal shift for the morning
16  just one custodial staff?
17   A.    Well, they have one that comes in at
18  5:30 in the morning, and the other guy comes in
19  around 9:00 in the morning. And then I come in --
20  well, at that time, I was coming in at 7:00, and
21  then I asked them if I could change it to 5:00 at
22  night. That was before Dilang was my supervisor.
23  And they agreed that it was okay, that I started
24  coming in at 5:00 at night.
25   Q.    So originally you were working during

Page 138

1  the daytime?
2    A.    Huh-uh. I was working from 7:00 p.m.
3  until 3:30 in the morning.
4    Q.    Oh, 7:00 p.m. Okay. That was --
5    A.    That was when Susan Hall was there and
6  Renae Jones.
7    Q.    Okay. And the gist of your claim of
8  discrimination against Ms. Saceda --
9    A.    Saceda.
10   Q.    -- was what?
11   A.    That she was treating me unfairly and
12  disrespectfully, and that I shouldn't be working
13  around past employees that are upset about my EEOC
14  filings.
15   Q.    And what is the status of that claim?
16   A.    I'm not sure.
17   Q.    Because that would have been -- if I'm
18  correct, that would have been filed this calendar
19  year, 2005?
20   A.    Yes.
21       MS. ROSE: My understanding is that
22  it was assigned for formal and accepted for formal.
23  And then within several weeks of being accepted for
24  formal, it was then subject to an administrative
25  decision to dismiss without an investigation because

36 (Pages 135 to 138)

Rosa Gaona * 9/20/2005
Gaona v. Potter * A04-114 CV (JKS)

Page 139

1　the issues were embraced within this litigation, I
2　believe. I don't have it with me, but I can
3　certainly send you the documents.
4　　Q.　Now, aside from the two additional EEO
5　claims that we have discussed this afternoon, are
6　there other EEO claims that are in or have been in
7　the administrative process that you feel are part of
8　this lawsuit?
9　　MS. ROSE: That are still -- well,
10　I'm going to object to the fact that I believe that
11　sort of calls for a legal conclusion right now,
12　given the status of -- and implicates
13　attorney-client privileged communications right now.
14　　MR. POMEROY: Well, I'm trying to
15　figure out what the heck I'm defending.
16　　MS. ROSE: Well, I can tell you --
17　　MR. POMEROY: And, you know, she's
18　filed a complaint, so --
19　　MS. ROSE: But there are two
20　different questions. There is the question about
21　what is in this litigation, and whether she's filed
22　other administrative claims. So it's sort of
23　compound also. But she can certainly answer the
24　question, "Has she filed any other administrative
25　claims," because you are missing one.

Page 140

1　　MR. POMEROY: According to my
2　records, she's filed a total of 14 EEO complaints
3　during her employment at the post office, so some of
4　them have been resolved. Some, the statute of
5　limitations has run on. Some, I know certainly are
6　addressed in this lawsuit. Two we have just
7　discussed.
8　　MS. ROSE: And there is another one
9　that is, quote, still in the pipeline from some
10　perspective. But I think, you know --
11　　MR. POMEROY: And which one is
12　that?
13　　MS. ROSE: That is the one we were
14　referring to off the record earlier as the "Douglas
15　complaint," which was filed and led to -- I'm going
16　to summarize briefly. I'll let her testify, but
17　this will help you a little bit.
18　　In the fall of 2003, her complaint
19　was assigned -- her issues around attempting to get
20　back to work were assigned to the administrative
21　committee of -- the Reasonable Accommodation
22　Committee, district level, that you referred to as
23　the DRAC, I believe, in one of your folders in your
24　initial disclosure. And that effort to come back to
25　work and unwillingness to place her led to an

Page 141

1　administrative EEO complaint that, in turn,
2　subsequently led to a medical recommendation to
3　remove, that was resolved without an EEO complaint,
4　which is what she's talking about as the agreement
5　to come back to work in a custodial capacity.
6　　So there are some other continuing
7　issues around the whole subject of reasonable
8　accommodation and efforts to return to work in the
9　fall of '03 to the spring of '04, before she was
10　placed in the --
11　　MR. POMEROY: -- custodial
12　position.
13　　MS. ROSE: -- custodial position,
14　that are the subject of one more administrative
15　complaint, which I believe is 00804. If you have a
16　list, I can identify it very readily since I
17　remember some of these numbers pretty clearly.
18　　MR. POMEROY: 00804, yes.
19　　MS. ROSE: And that is the one that
20　I just received on Friday -- well, that we tried to
21　segregate out from this litigation as a deliberate
22　effort to try to have it addressed administratively.
23　And it was sent to -- was briefed and sent off to
24　the federal operations of EEOC after a request for a
25　final agency decision. And the final agency

Page 142

1　decision was that it was embraced within this
2　litigation, and we opposed that. And despite my
3　advocacy, trying to take the position that it was a
4　separate matter and not embraced within this
5　litigation, the OFO has now looked at a copy of the
6　second amended complaint and concluded that they
7　believe it is.
8　　So we have now received a, quote,
9　right to sue on that as a final agency decision, and
10　I'm hoping we can, hopefully, agree as counsel and
11　counsel to identify clearly what complaints are in
12　this litigation, not together.
13　　And I don't think it's for my
14　client right now, because there has been confusion
15　among the agency and the OFO and various else to
16　make the legal conclusions about what is in this
17　litigation or not. It was not her initial intention
18　to embrace all these current complaints within the
19　litigation, but I'm believing right now, given what
20　the status is, that it's in everybody's interest
21　that we try to consolidate these matters as much as
22　possible. So I can certainly appreciate your
23　frustration, but I guess all I can say is I'm
24　equally frustrated.
25　　MR. POMEROY: I wouldn't say

37 (Pages 139 to 142)

Rosa Gaona * 9/20/2005
Gaona v. Potter * A04-114 CV (JKS)

Page 143

1  frustration. Just confusion.
2       MS. ROSE: Well, confusion. And I
3  know I did offer at one point to send you a copy of
4  the briefing I have done to OFO, and I'm still happy
5  to do that; but it seems moot at the moment, given
6  where things are going.
7       So I'd like to sort of go through
8  that list, because I did see that you had a list,
9  and unpack -- we are happy to stipulate to what we
10  think is in the litigation or isn't. And if you
11  want to go off the record and do that --
12       MR. POMEROY: What was in the
13  "Douglas" --
14       MS. ROSE: I call it the "Douglas
15  complaint" because there was an effort to return --
16  she had a preferred assignment before the Mendenhall
17  assignment came up, which was a route in Douglas
18  that she'd identified as a reasonable accommodation,
19  that she learned in the course of '03 had been bid,
20  despite her knowledge, to another person -- despite
21  her seniority. It was never awarded to her,
22  essentially. That was part of what the '03 -- the
23  00804 complaint is about.
24       MR. POMEROY: Okay. So there
25  wasn't actually any employment at the Douglas

Page 144

1  office?
2       MS. ROSE: No. No. But I call it
3  that because it refers to the opportunity in
4  Douglas. Does that help?
5  BY MR. POMEROY:
6       Q.  So, Ms. Gaona, I think you and I are
7  both a little confused. Is that a fair
8  characterization?
9       A.  There is a lot going on.
10       Q.  Let me give you -- hand you a copy --
11       A.  May I take a break?
12       Q.  Oh, absolutely. That's the ground
13  rules. If you need a break, we go off the record.
14  2:22 PM
15       (Off record)
16  2:33 PM
17       MR. POMEROY: Let's go back on
18  record.
19  BY MR. POMEROY:
20       Q.  While we were off stretching and
21  chatting and such, Ms. Gaona, you've reviewed a
22  listing, I think, from a postal service Web site on
23  the different EEO complaints that you have filed
24  over the years. And is it my understanding -- you
25  nodded yes to

Page 145

1       A.  Yes.
2       Q.  Okay. And is it my understanding that,
3  just from the information on this chart, you cannot
4  differentiate one claim from another?
5       A.  Not just sitting here, no.
6       Q.  Okay.
7       A.  I mean, I know the latest, the last
8  three that are there, yes.
9       Q.  Which, I think, is what your counsel had
10  identified prior to our break. Is that correct?
11       MS. ROSE: Which is 00804, which is
12  the subject of the Douglas opportunity that was not
13  provided and efforts to get back to work in the fall
14  of '03 and the spring of '04; and the 37-04, which
15  is about the mistreatment by Stuart that you have
16  already testified to, as well as the controversy
17  around taking a lunch.
18       So there are some earlier ones
19  referenced from -- with 01 numbers that we can't
20  identify without looking at the formal complaint or
21  report of investigation.
22  BY MR. POMEROY:
23       Q.  Okay. And one question, and I apologize
24  if I have asked it already, but the Northam incident
25  with Stuart Akagi -- again, making, I guess, what

Page 146

1  you characterized as derogatory comments about you,
2  since that occurred in the downtown post office, how
3  did you hear about that?
4       A.  Through an employee that was standing
5  right there.
6       Q.  Who was that?
7       A.  Mr. -- what's his name? Howard --
8       MS. ROSE: Elsner.
9       A.  -- Elsner, yeah.
10       Q.  Who is Tammy Mallory?
11       A.  That's a roommate that I had at the
12  time.
13       Q.  Okay. And Jan Dobbins?
14       A.  She was a roommate.
15       Q.  At the same time?
16       A.  No. Jan Dobbins was a roommate of mine
17  when I first got injured in '95.
18       Q.  And then Tammy Mallory at a later date?
19       A.  Yes. '98.
20       Q.  And someone you identify in your
21  preliminary witness list as just named Virginia?
22       A.  Virginia, yes. I don't know her last
23  name. She was downtown when Ken Cickler was yelling
24  and screaming and sticking his finger in my face on
25  the workroom floor. But she's no longer in the

38 (Pages 143 to 146)

Rosa Gaona * 9/20/2005
Gaona v. Potter * A04-114 CV (JKS)

Page 147

1 U.S., I understand. She's gone back to the
2 Philippines.
3    Q. Oh, she was Filipino?
4    A. Yes.
5    Q. Laura Hinkman? Who is she?
6    A. It is been a long time since -- she was
7 injured, and I can't remember exactly. Edwin Soto
8 would know more about her situation, but she gave me
9 her name. She was accommodated at Mendenhall
10 station for some type of injury. I'm not --
11 honestly, I cannot remember what the circumstances
12 were around her situation.
13       MS. ROSE: And just to represent,
14 that preliminary witness list was obviously drawn up
15 with the scope of the complaint being the '95
16 Carroll hearing limitation that may be changing,
17 incidentally.
18       MR. POMEROY: Yes.
19       MS. ROSE: Okay.
20       MR. POMEROY: Since I think it's
21 safe to say that the status of this case is in flux,
22 I think that the questions I have at this
23 time, with the understanding that I reserve the
24 right to continue the deposition, depending upon
25 what -- well, one, if we have an amended complaint;

Page 148

1 or, two, depending upon the clarification of
2 additional matters that may be -- that are in the
3 administrative pipeline that were not intended to be
4 covered in this litigation but may be added to this
5 litigation, because we may need to explore some
6 items that were not covered here.
7       So I just want to say, rather than
8 concluding, we are just recessing, reserving the
9 right to continue the deposition.
10       Is that acceptable to counsel?
11       MS. ROSE: Yes. I mean, with the
12 understanding that, hopefully, we also have some
13 discovery cutoff issues, obviously, based on the
14 prior schedule, and that because of the fluctuating
15 nature of the discovery, that, hopefully, you and I
16 will either spend some time now, if you are
17 available, to talk about some of these procedural
18 issues off the record and resolve as many of them as
19 possible -- and then that means completing her
20 deposition wouldn't be occurring today or in the
21 immediate future.
22       MR. POMEROY: Correct. At some
23 future time.
24       MS. ROSE: Do you have any
25 questions about that? Do you want to go off the

Page 149

1 record?
2       Let's off the record for just a
3 moment.
4 2:20 PM
5       (Off record)
6 2:42 PM
7       MR. POMEROY: Back on record.
8 BY MR. POMEROY:
9    Q. I understand from the break that you
10 wanted to add something to --
11    A. Well, she's already on the list. I
12 think we missed her. Linda Martinsegal.
13    Q. Okay. I don't recall that. Let's --
14    A. Her last name is spelled
15 M-A-R-T-I-N-S-E-A -- I mean, I'm sorry,
16 M-A-R-T-I-N-S-E-G-A-L, first name Linda.
17    Q. And who is she?
18    A. She's a postal -- was a postal employee
19 for many years. I first met her in 1986, downtown.
20 She has always had a very serious mental condition
21 that caused not only her work, but people around
22 her, problems. And Ruth Drake went through many,
23 many extremes to help keep this woman at work.
24       So she was another person that was
25 accommodated. That's all I had to say about that.

Page 150

1    Q. Okay. And what was her mental
2 condition, if you know?
3    A. If I understand correctly, she was --
4 she is a schizophrenic, depressed person. Nothing
5 derogatory towards her. Actually, I was very good
6 friends with her. But she was accommodated way
7 beyond -- to have a manager help you stay at work,
8 again, that tells you a lot.
9    Q. And do you recall when she ended
10 employment with the postal service?
11    A. She finally retired out due to union
12 suggestion, I believe -- now, I'm going to say about
13 1999, but I'm not real sure.
14    Q. Okay.
15       MR. POMEROY: I think we are able
16 to conclude for today.
17       MS. ROSE: Thank you.
18       THE WITNESS: Thank you.
19       (Deposition adjourned at 2:44 p.m.)
20
21
22
23
24
25

39 (Pages 147 to 150)

Subj:    **RE: Proposed Amended Complaint-Gaona v. Potter**
Date:    11/8/2006 11:57:02 A.M. Pacific Standard Time
From:    Richard.Pomeroy@usdoj.gov
To:    PRose83897@aol.com
CC:    leigh.k.bonds@usps.gov

Sorry, but we won't stipulate to amending the complaint.

---

**From:** PRose83897@aol.com [mailto:PRose83897@aol.com]
**Sent:** Friday, November 03, 2006 1:00 PM
**To:** Pomeroy, Richard (USAAK)
**Subject:** Proposed Amended Complaint-Gaona v. Potter

Please review and indicate whether you would stipulate to this.

LAW OFFICE OF PATRICIA S. ROSE
157 Yesler Way, Suite 503
Seattle, Washington 98104
(206) 622-8964 (voice)
(206) 622-2593 (fax)
www.giget.com/roselaw

Notice: This transmission is intended for the sole use of the individual and entity to whom it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. You are hereby notified that any dissemination, distribution or duplication of this transmission by someone other than the intended addressee or its designated agent is strictly prohibited. If your receipt of this transmission is in error, please notify this firm immediately by collect call (206)-622-8964, or by reply to this transmission

**EXHIBIT NO. _C_**